## Case No. 10,271.

### NINE HUNDRED AND SEVENTY-NINE BOXES OF SUGAR.

[7 Ben. 242.] [1]

District Court, E. D. New York. March, 1874.

BILL OF LADING AND CHARTER PARTY — FREIGHT —SIGNATURE UNDER PROTEST—PRACTICE —POSSESSION.

1. A vessel was chartered to bring a cargo of sugar and molasses, from Havana to New York, at specified rates of freight. No provision for bills of lading specifying a different rate of freight was embodied in it. The cargo was agreed by the charter to be bound for the faithful performance of the agreements contained in it. At Havana a modification, agreed upon between the captain of the ship and the agents of the charterers, was indorsed on the charter, in which a lump sum of $3,828 was specified as freight. Under this agreement, 979 boxes of sugar were shipped. Some days after its shipment the charterers' agents required the master to sign bills of lading for the sugar, providing for its delivery at New York, to order, on payment of freight at the rate of one dollar a box, and making no reference to the charter party. The master, insisting that this was not according to agreement, signed the bills of lading, but wrote before his signature, the words "Signed under protest." The shippers indorsed and delivered these bills of lading to P. & Co. who indorsed and delivered them to Y. & Co. at New York, who, on the arrival of the vessel at New York, tendered to the master the $979, and demanded the sugars. The master refused to deliver them, except on payment of the full balance of the charter money. Y. & Co. then filed a libel against the sugar and the master of the vessel, praying that the sugar might be seized under the process, and by a decree of the court delivered to them. On this libel process was issued as in a cause of possession, and the property was taken into the custody of the marshal, and thereafter, on consent of the parties, delivered to the libellants on their giving a stipulation in the sum of $4,000, which, it was agreed, was to be considered as in the place and stead of sugar to that value held in custody by the marshal. No question was raised as to the regularity of the practice, and both parties agreed that the claimants should have a decree that the libellants pay the amount of their stipulation into court, for the benefit of the claimants, in case the court should determine that the ship owner had a lien on the sugar for the amount due under the charter party. *Held*, that no opinion would be expressed as to the regularity of the practice, and the question of law would be determined as desired by the parties.

2. The ship owner had a lien on the sugar, for the unpaid balance of charter money.

3. The libellants were put on inquiry by the words written on the bills of lading by the master, and were not therefore bona fide holders of them without notice.

4. A decree would be made, that the stipulators for value pay the amount of their stipulation into court, for the benefit of the claimants, and that the libel be dismissed, and a decree rendered against the libellants for costs.

In admiralty.

Scudder & Carter, for libellants.
J. N. Whiting, for claimants.

BENEDICT, District Judge. The mode of procedure adopted to bring before the court

---

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

the question in dispute between these parties is unusual, and may as well be here stated, although no point has been made before me in respect thereto. The libel is filed by Henry J. Youngs & Co., consignees and holders of a bill of lading for 979 boxes of sugar, being the cargo of the bark Tantivy, against this merchandise and the master of the bark, who has upon a demand by the libellants refused to deliver the merchandise, except on payment of a balance of charter money, for which it is claimed the cargo is holden by virtue of a charter party.

The prayer of the libel is that the merchandise may be taken by the process of the court, and by a decree of this court delivered to the consignees and holders of the bill of lading. Upon this libel process was issued as in a cause of possession, and the property, having been taken into custody by the marshal, was thereafter upon consent delivered to the libellants, upon their filing a stipulation for value in the sum of $4,000 which, it is agreed, is to be considered as in the place and stead of so much of the sugar as would be of that value, had the same been held in custody by the marshal. Thereupon the master and owners of the ship, having duly claimed the property, filed their answer, setting up the facts upon which they base their right to hold the cargo for the unpaid balance of the charter money, and denying that they were bound to deliver the cargo upon the tender of the freight named in the bill of lading, as charged by the libellant in his libel. Upon these pleadings, the cause has been brought to hearing, both parties consenting that the claimants are entitled to a decree requiring the libellants to pay into the registry for the benefit of the claimants, and in conformity with the terms of the stipulation for value, the amount of the stipulation in case this court shall adjudge the ship owners to have a lien upon the cargo for that amount due under the charter party.

As to the propriety of this method of procedure, I am not required to express any opinion, no question being made in respect thereto. Whether open to technical objections or not, it seems to have accomplished what both parties have desired, namely: a delivering of the cargo to the owners thereof, upon their giving security for the freight pending the determination by a court of the amount of freight due.

I proceed, therefore, to determine the question which the parties have thus sought to present. The facts, upon which my determination is to be made, are admitted to be correctly stated in the answer, upon which, without other evidence on either side, the cause has been submitted.

It appears, then, that the bark Tantivy was chartered in New York by Messrs. Duncan and Poey, for a voyage from New York to Havana via Norfolk and back. The charter party contained among other, the following provisions: "The party of the second part doth engage to provide and furnish to the said vessel at Norfolk, a full and complete cargo of shooks and hoops, or other ordinary lawful merchandise, and in Cuba a full and complete cargo of sugar and molasses in hhds., with ten per cent. small stowage under deck, and to pay to the said party of the first part, or agent, for the use of the vessel during the voyage, outward cargo freight free, for which charterers are to pay all the vessel's foreign port charges, pilotage, lighterage and consul fees. For homeward cargo delivered, as follows, viz.: Sugar under deck, $7 per hhd.; molasses under deck, $4.75 per 110 gals., gross gauge of the casks. Charter money payable upon the proper discharge of the cargo at port of final discharge." The following clause is also to be found in the charter party: "To the true and faithful performance of all and every of the foregoing agreements, we the said parties do hereby bind ourselves, our heirs, executors, administrators and assigns, and also the said vessel, freight, tackle and appurtenances, and the merchandise to be laden on board, each to the other, in the penal sum of estimated amount of this charter."

Under this charter party the vessel carried an outward cargo to Havana, where the charterers were represented by Messrs. Pardo Infante & Co., their agents. There, some difficulty preventing the shipment of the homeward cargo according to the charter party, a modification of the charter party was agreed on between the master and Pardo Infante & Co., the agents of the charterers, and written on the charter party as follows: "The agents for the charterers and master of ship Tantivy hereby agree that the vessel shall take a cargo of sugar in hhds. or boxes, the charterers to settle for same at port of destination, say New York or Philadelphia, touching at Delaware Breakwater for orders, for the lump sum of thirty-eight hundred and twenty-eight dollars, in United States currency, without prejudice to the other conditions of said charter party. St. James Carey. Havana, 4th July, 1872. To Pardo Infante & Co."

The validity of this modification has not been disputed here, and under the charter party so modified, the 979 boxes of sugar in question were laden on board the vessel. Some ten days after the sugar had been thus laden on board the ship, Messrs. Pardo Infante & Co. required the master of the ship to sign a bill of lading stating a shipment of the 979 boxes of sugar to be delivered at New York, unto order, on paying freight for the said goods, one dollar per box, and containing no allusion to the charter party or to any other rate of freight. This bill of lading the master, while protesting that it did not contain the contract under which the sugar had been shipped and was to be carried, did sign, but he prefixed to his signature the words, "Signed under protest." The bark then proceeded to New York, where, upon arrival and readiness to deliver the sugar,

these libellants, who had become holders of the bill of lading above referred to, by an indorsement thereupon from Pardo Infante & Co., to Messrs. J. Pollido & Co., and from Pollido & Co. to them, tendered to the master $979, the freight mentioned in the bill of lading, and demanded the sugars. The master, thereupon, on the navigable waters of the United States, refused to deliver the sugars except upon the payment of a much larger sum, to wit: the balance of the charter money due according to the terms of the charter party, as modified in Havana. Upon this demand and refusal, the present action was instituted, and upon these facts I am asked to determine whether this cargo is holden for the unpaid balance of the charter money, or should have been delivered to the consignee on payment of the freight mentioned in the bill of lading.

In determining this question of law, I remark that the bark was not a general but a chartered ship. The charter party contains no provision for any bills of lading at a different rate of freight than that named in the charter party, nor for the transporting of any cargo except such as the charterers should furnish. Of the existence of this charter and of its terms, Pardo Infante & Co. knew. In fact, acting as agents of the charterers, they made the modification of the charter party which fixed the freight the cargo was to pay. With this knowledge, and acting as agents of the charterers, they shipped the sugars in question under the provisions of the charter party, and not under any such contract as that stated in the bill of lading. As between them or their principals, the charterers and the ship owner, therefore, the cargo, upon its shipment, became charged with a lien for whatever might become due under the charter party, upon the performance of the voyage for which the charter party provided. No other agreement was ever made for the transporting of this cargo, it being as well known to Pardo Infante & Co., as to the master, that no such contract as that stated in the bill of lading had been agreed to when the cargo was laden on board or afterwards, but that the real contract under which the cargo had been shipped was to be found in the charter party as modified.

There is no room, therefore, to contend that the terms of the bill of lading must fix the amount due the owners of the ship upon this cargo unless upon the ground that the ship owners are estopped by the act of the master in signing the bill of lading to deny the contract which the bill of lading states.

It appears sufficient for this case, to say they are not so estopped because the holders of such a bill of lading as here shown cannot be said to be bona fide holders without notice, but, on the contrary, are chargeable with notice of the fact that the bill of lading does not contain the contract under which these sugars were shipped. For this was no clean bill of lading. It contained the words "Signed under protest," boldly and prominently placed above the master's signature. These words are unusual and calculated to attract attention. They convey, in themselves, the idea that the bill of lading is not true, and has never been assented to by the master, and they are sufficient to put any party to whom the bill of lading should be offered upon inquiry. They "suggest inquiry." They "cast a shade upon the transaction." Story, Prom. Notes, § 197. They "ought to have excited the suspicion of a prudent and careful man." Chit. Bills, pp. 278, 279. Being sufficient to put the party on inquiry, they constitute notice of any fact which inquiries prosecuted with due diligence would have disclosed. The Plough Boy, 1 Gall. 41, [Case No. 11,230]. Such a bill of lading conveyed the knowledge that the master of the ship claimed that the contract was incorrectly stated in the bill of lading, and the holders are presumed to have ascertained the grounds of that claim, or to have been guilty of a degree of negligence equally fatal to the claim to be bona fide holders without notice. Knowledge of the charter party and of the shipment of the goods under it, with which, under this bill of lading the holders are chargeable, deprives the libellants of any right to claim the goods upon payment of the freight named in the bill of lading. 1 Pars. Mar. Law, p. 241. To entitle them to the goods, they must pay the balance due according to the charter party, for which, by the express terms of the charter party, the ship owner has a lien upon the cargo.

Accordingly, in pursuance of the stipulation and consent given in this case, a decree must be entered directing that the stipulators for value pay into the registry of the court for the benefit of the claimants, and in discharge of the claimants' lien upon the cargo in question, the amount of the stipulation for value; and therefore, the libel will be dismissed and a decree entered in favor of the claimants for their costs to be taxed.